IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

D. MCCALL,

     Plaintiff,

v.                                    No. 1:21-cv-00715-DHU-LF

WAGNER EQUIPMENT CO.,
*a foreign for-profit corporation*,

     Defendant.

## MEMORANDUM OPINION AND ORDER

     This is a dispute over whether Defendant Wagner Equipment Co. reneged on an oral promise to pay Plaintiff D. McCall a 1% fee for his services in a real estate transaction. In Defendant's Motion for Summary Judgment, Defendant argues that it never agreed to pay Plaintiff a fee, and that even if it had, such an agreement would be unenforceable under N.M. Stat. Ann. § 47–1–45, which extends the Statute of Frauds to oral brokerage contracts. Plaintiff responds in opposition that he was not a "broker," but a consultant, and therefore the Statute of Frauds does not apply. Because genuine issues of material fact exist concerning Plaintiff's status as a broker, the Court concludes that Defendant's summary judgment motion (Doc. 23) is DENIED.

## BACKGROUND

     The following facts are taken from the summary judgment record, which consists of declarations, transcripts of depositions, emails and correspondence, undisputed material facts, and other evidence of record. The Court presents the facts and evidence in the light most

favorable to Plaintiff as the summary judgment non-movant. *See Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1218 (10th Cir. 2014).

Defendant is a Colorado-based heavy equipment dealer that conducts business in New Mexico. *See* Def.'s Undisputed Material Fact ("UMF") ¶ 1, Doc. 23. For many years, Defendant maintained its Albuquerque-area headquarters on Osuna Road (the "Osuna Property"). *Id.* at ¶ 2. But eventually Defendant decided to sell the Osuna Property and relocate to Albuquerque's South Valley. *Id.* at ¶ 3. In early 2015, Albuquerque Public Schools ("APS") became interested in buying the Osuna Property. *Id.* at ¶ 5. The property was listed with Allen Sigmon Real Estate Services ("Allen Sigmon"), a listing broker that Defendant had used in the past. *Id.* APS's real estate director, Martin Eckert, saw the Osuna Property listed with Allen Sigmon, so Mr. Eckert contacted Allen Sigmon about purchasing the property. Eckert Depo. 5:18-24, Doc. 25-2. All negotiations between APS and Defendant were handled through Allen Sigmon. *Id.*; Def.'s Reply, 4, Doc. 29.

APS expressed its interest in the Osuna Property through a "Letter of Interest." Doc. 25-3. The Letter of Interest was sent to Allen Sigmon, who in turn forwarded it to Defendant on APS's behalf. Pomeroy Depo., 5:11-12, Doc. 23-3. APS and Defendant later agreed on a $11,700,000.00 purchase price for the property. Def.'s UMF at ¶ 6. The Letter of Interest stated that Defendant would be "responsible for paying a brokerage fee per separate agreement to … Allen Sigmon …" Letter of Interest, at 5. The letter also described Allen Sigmon as Defendant's broker. *See id*.

It became evident from the early negotiations between Defendant and APS that there was one especially complex issue about APS's prospective purchase of the Osuna Property. Def.'s UMF at ¶ 8. Because Defendant would not be ready to vacate the Osuna Property until the South

Valley property was ready, which could take several years, Defendant would need to lease back the Osuna Property from APS after APS bought the property. *Id*. Defendant and APS believed that the terms of any leaseback agreement would be included within the eventual purchase agreement paperwork for the Osuna Property. *Id*. The leaseback agreement was a topic that APS and Defendant discussed during negotiations. *See id*. According to Kevin Pomeroy, Defendant's director of operations, Defendant "disagreed with APS's preferred leaseback terms. [Defendant] wanted a longer leaseback period, and a lower rental rate, than what APS was proposing." Pomeroy Decl. ¶ 13, Doc. 23-1.

Defendant and APS scheduled an April 7, 2015 meeting at Allen Sigmon's office to hold further discussions about the leaseback terms. *Id*. at ¶ 13. Around this same period, Defendant first communicated with Plaintiff about Defendant's negotiations with APS. Def.'s UMF at ¶ 13. Plaintiff is a licensed real estate broker. *Id*. at ¶ 14. He owns and operates a real estate firm called Midway Leasing, Inc. ("Midway"). *Id*. Defendant's CEO, Bruce Wagner, and Plaintiff personally knew one another. *Id.* at ¶ 15.[1] Plaintiff and Defendant discussed Defendant possibly hiring Midway to provide consulting services for the South Valley property. *Id.* at ¶ 17. The topic of the Osuna Property sale also came up, and Mr. Wagner asked Plaintiff to attend the April 7, 2015 meeting on Defendant's behalf. *Id.* at ¶¶ 18-19.[2]

---

[1] The "Introduction" and "Background" sections of Plaintiff's summary judgment response brief describe multiple prior contract disputes between Mr. Wagner and Mr. McCall. Defendant replies that Plaintiff has mischaracterized those disputes and that Plaintiff has made unsubstantiated accusations. The Court need not delve into or even describe the parties' prior lawsuits because Plaintiff did not cite those lawsuits as material facts for which genuine issues exist pertaining to the current motion.

[2] In support of Defendant's Undisputed Material Fact number 19 (that Mr. Wagner talked to Plaintiff about attending the April 7 meeting) Defendant cites a portion of Mr. Wagner's transcript that is not actually in the record. Nevertheless, because Plaintiff does not dispute this

Before the April 7 meeting occurred, Plaintiff learned that Mr. Wagner was not optimistic about the APS deal going through. *See* McCall Depo. 18:16-25 – 19:1-6, Doc. 23-6. In a phone call, Mr. Wagner told Plaintiff that there were "three things" that Mr. Wagner found problematic: (1) the leaseback's term three-year term was too short, (2) the lease rate of 6.5% was too high, and that (3) Allen Sigmon's 6% commission fee was likewise too high. *Id.* at 20:1-14. According to Plaintiff, in a conversation the following day, Mr. Wagner reiterated these three items of concerns with the deal and told Plaintiff: "[Y]ou're going to go negotiate the deal and you're my consultant. You go negotiate the deal, and I'll pay you one percent when it closes, if it closes." *Id.* at 24:11; 25:13-14.

In the weeks before the April 7 meeting, Plaintiff and Mr. Pomeroy exchanged emails about the meeting. Def.'s UMF at ¶ 23. In one email, Mr. Pomeroy told Plaintiff that Allen Sigmon understood that Plaintiff would represent Defendant at the meeting. *Id.* at ¶ 24. When the April 7 meeting finally came, Plaintiff was accompanied by Mr. Pomeroy and Mike Quirk, both representatives of Defendant. *Id.* at ¶ 25. During the meeting, Plaintiff pushed for more favorable leaseback terms for Defendant. *Id.* at ¶ 26. According to Defendant, APS representatives were frustrated during the meeting and no final agreement was reach with APS about Defendant's proposed leaseback terms. Pomery Depo. at 13:2-10; Pomery Decl. at ¶ 20. According to APS representative Martin Eckert, however, APS and Defendant in fact "ended up negotiating an agreement." Eckert Depo. 11:1-2, Doc. 25-2.

As noted earlier, Plaintiff was also tasked with negotiating Allen Sigmon's commission fee. During the April 7 meeting, Plaintiff told Allen Sigmon representatives that Defendant had committed to a 3% commission for Allen Sigmon. McCall Depo. at 39:12-15. Plaintiff waited

---

fact, *see* Doc. 25 at 5, the Court will treat the fact as uncontested and consider it in its summary judgment analysis.

for Lance Sigmon of Allen Sigmon to sign the agreement reflecting a 3% commission fee. Sigmon Depo. at 28:10-11. According to Mr. Sigmon's later deposition testimony describing the meeting, he told Plaintiff that he would "accept the 3 percent," but asked Plaintiff to "go back and ask Bruce [Wagner]" and determine "if we can do 4 percent instead of 3 percent[.]" *Id.* at 28:16-18. Mr. Wagner later rescinded the offer to pay Allen Sigmon the three-percent commission fee. *Id.* at 22:19-22.

After the April 7 meeting, Plaintiff did not participate in further negotiations with APS about the Osuna Property. Def.'s UMF at ¶ 28. Nor did Plaintiff participate in further negotiations with Allen Sigmon about its high commission fee. *Id.* After the meeting, Mr. Quirk and APS representatives began direct negotiations about open issues relating to the Osuna Property. *Id.* at ¶ 29. Several weeks later, APS and Defendant entered into a Purchase and Sale Agreement for the property. *Id.*; Doc. 23-10. The agreement contained terms for Defendant to lease the Osuna Property back from APS. Def.'s UMF at ¶ 30. The deal went through some restructuring and the sale finally closed in November 2020. *Id.* at ¶ 31. Defendant ultimately agreed to pay Allen Sigmon a 2.25% fee. *Id.* at ¶ 32.

The parties agree that no written contract exists stating that Defendant would pay Plaintiff a 1% consulting fee for his services. *Id.* at ¶ 33. The parties also agree that the first reference to the fee was made in a December 13, 2016 email—more than one-and-a-half-years after the April 7 meeting—in which Plaintiff attempted to request payment. *Id.* at ¶ 35. Defendant denies that it entered into any agreement to pay Plaintiff a commission fee and contends that Mr. Wagner never offered to pay Plaintiff a consulting fee. *Id.* at ¶ 36. But even if such an agreement did exist, Defendant maintains that it would be void because Plaintiff acted as a real estate broker or agent, and broker agreements must be in writing to be enforceable. *See*

Doc. 23 at 2. Plaintiff argues that he acted as a consultant, not a broker. Def.'s UMF at ¶ 28. Plaintiff argues, among other things, that he did not engage in typical activities of a broker, such as such as showing APS the property or presenting information about the property's square footage, size, location, and condition. *Id.*

In June 2021, Plaintiff filed a complaint for damages in New Mexico state court. *See* Doc. 1-1.[3] Following removal, Defendant pleaded a Statute of Frauds defense as its third affirmative defense, stating that Plaintiff's "claim is barred by the statute of frauds, or other laws requiring that real estate commissions agreements be in writing." Doc. 2, 2. Defendant now moves for summary judgment based on this affirmative defense, which the Court proceeds to analyze below.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Tesone v. Empire Mktg.*

---

[3] Plaintiff's two-page complaint consists entirely of "factual allegations" without specifying legal causes of action or and therefore it is not entirely clear what Plaintiff's legal theories are.

*Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). When "the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden by providing 'affirmative evidence that negates an essential element of the nonmoving party's claim' or by 'demonstrat[ing] to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.'" *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 331 (1986)). The burden then shifts to the opposing party to come forward with admissible evidence to create a genuine issue of material fact on that element. *See Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991).

This procedure changes, however, when a defendant moves for summary judgment "to test an affirmative defense." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). In that situation, the defendant must first "demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Id.* If the defendant makes this initial showing, the plaintiff "must then demonstrate with specificity the existence of a disputed material fact," *id.*, but only "relative to the affirmative defense," as opposed to "each element essential to the case." *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021) (emphasis omitted). Ultimately, "where the moving party has the burden [of proof]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis omitted).

## DISCUSSION

Defendant moves for summary judgment on its third affirmative defense, that Plaintiff and Mr. Wagner formed an unenforceable oral brokerage contract under N.M. Stat. Ann. § 47–1–45. Defendant then raises two rebuttal arguments to Plaintiff's anticipated arguments. First,

Defendant argues that the doctrine of partial performance, which is an exception to the Statute of Frauds, does not apply. Second, Defendant argues that the scope of § 47–1–45 applies to Plaintiff's negotiation of Allen Sigmon's fee.

**1. There is a genuine issue of material fact about Plaintiff's status as a broker**

Summarizing the parties' arguments, Defendant argues that it never promised to pay Plaintiff a fee. And even if a factual dispute existed over whether Defendant did make such a promise, Defendant argues that any such promise would be void as a matter of law because Plaintiff was acting as a "broker" or an "agent" in the Osuna Property transaction and oral brokerage contracts are unenforceable in New Mexico. Defendant argues that all the relevant evidence suggests that Plaintiff acted as broker or agent: the leaseback that Plaintiff negotiated was essential to the Osuna Property deal going through and the proposed leaseback terms were included in the purchase offers and counteroffers, along with the final purchase agreement. Defendant argues that this and other evidence clearly demonstrates that Plaintiff acted as a broker during the deal.

Plaintiff disputes these characterizations of his role in the transaction. Plaintiff argues that he acted as a consultant, not a broker or agent. Plaintiff points out that "[t]here was already a broker employed for the APS transaction, Allen Sigmon, and … no one intended … Mr. McCall to work along Allen Sigmon, or to share in its commission." Doc. 25 at 11. Although Plaintiff does hold a broker license, he claims that his license did not make him a broker as to the particular transaction in question. He also argues that he did not engage in broker activities: he "did not procure APS as the buyer, did not have first-hand knowledge of the terms of the agreement; was not responsible for negotiating the price or other material terms; and his only goal and responsibility was to 'salvage' the transaction that had already been negotiated." Doc.

25 at 12. Plaintiff further argues that "at a minimum, the capacity in which [he] was employed is an issue of fact for the jury." *Id.* at 9.

The statute on upon which Defendant's defense is based is N.M. Stat. Ann. § 47–1–45. That statute is entitled "Real estate brokerage agreements required to be in writing" and provides in relevant part that:

> [a]ny agreement … authorizing or employing an agent or broker to purchase or sell lands, … or any interest in or concerning them, for a commission or other compensation, shall be void unless the agreement, or some memorandum or note thereof shall be in writing and signed by the person to be charged therewith ….

N.M. Stat. Ann. § 47–1–45.

The statute is "an extension of the Statute of Frauds …."[4] *Lindsey v. Cranfill*, 61 N.M. 228, 230, 297 P.2d 1055, 1056 (N.M. 1956), *disapproved of by Carney v. McGinnis*, 68 N.M. 68, 358 P.2d 694 (N.M. 1961) (citation omitted). The purpose of N.M. Stat. Ann. § 47–1–45 is "to protect the public against frauds perpetrated by dishonest agents through falsely claiming oral contracts of agency when another agent effected a sale by which the landowner was subjected to claims for commission by two or more agents, and by falsely claiming agency and claiming a commission for procuring a purchaser when no bona fide purchaser was in fact procured." *Harris v. Dunn*, 55 N.M. 434, 437–38, 234 P.2d 821, 823 (N.M. 1951).

The Court holds that there are genuine disputes of material fact about whether Plaintiff acted as a broker. Perhaps a jury could find that Plaintiff's conduct in the transaction indicated he was a broker. Defendant emphasizes that if Plaintiff performed his duties for pay, then he meets

---

[4] New Mexico does not have a codified Statute of Frauds, but the State has adopted the English Statute of Frauds as part of the State's common law. *See Leon v. Kelly*, 618 F. Supp. 2d 1334, 1341 (D.N.M. 2008); *Adams v. Thompson*, 87 N.M. 113, 116, 529 P.2d 1234, 1237 (N.M. Ct. App. 1974).

the definition of a broker. *See PC Carter Co. v. Miller*, 149 N.M. 660, 665, 253 P.3d 950, 955 (N.M. Ct. App. 2011) (defining a broker as one "who acts on behalf of a principal and receives compensation or other consideration from another for his services.") Defendant also has evidence that Plaintiff was described as Defendant's representative for the April 7 meeting. *See Poorbaugh v. New Mexico Real Est. Comm'n*, 91 N.M. 622, 623, 578 P.2d 323, 324 (N.M. 1978) (noting that broker status may depend on whether the person represented himself as a broker to the buyer or seller). In addition, the proposed leaseback terms were included in the purchase offers and counteroffers and the final purchase agreement itself, possibly suggesting that Plaintiff was involved in negotiating essential terms of the transaction.

On the other hand, a jury may find convincing Plaintiff's argument that he was not a broker. Plaintiff has evidence that Allen Sigmon was the broker employed for APS. There is also evidence that Plaintiff did not show APS the property or present information about the property's square footage, size, location, and condition. "A 'broker' is commonly known as one whose business it is to bring a buyer and seller together," and on that score Plaintiff points out that he did not procure APS as the buyer. *Watts v. Andrews*, 98 N.M. 404, 407, 649 P.2d 472, 475 (N.M. 1982). Plaintiff also argues that he lacked first-hand knowledge of the terms of the agreement, that he was not responsible for negotiating the price or other material terms, and that his role was limited to midstream negotiations. *Cf. PC Carter*, 149 N.M. at 664, 253 P.3d at 954 (concluding that the plaintiff was a broker because but for the plaintiff's activities, the buyers would not have known that unlisted property was for sale). The Court holds that the jury should be able to hear the testimony from Plaintiff, Mr. Wagner, and others, as to the pertinent conversations and to evaluate and consider the documentary evidence in the record such as the emails, correspondence, and other documents to determine whether Plaintiff acted as broker. The Court

therefore denies Defendant's request for summary judgment declaring that Plaintiff was a broker as a matter of law.

Apart from its broker-status arguments, Defendant also contends that Plaintiff cannot meet the requirement that the agreement be in writing and signed by Mr. Wagner. Recall that under the statute, brokerage agreements "shall be void unless the agreement, or some memorandum or note thereof" is "in writing and signed by the person to be charged." N.M. Stat. Ann. § 47–1–45. "To satisfy the statute of frauds the contract itself must be in writing." *Bosque Farms Home Ctr., Inc. v. Tabet Lumber Co.*, 107 N.M. 115, 117, 753 P.2d 894, 896 (N.M. 1988). Or, as here, if the contract is verbal, "then there must have been some writing subsequently made however informal, stating each of its essential elements, signed by the person to be charged, or by his authorized agent …." *Id.* Defendant argues that even the informal email exchanges in the record lack the essential elements of the agreement and that there are no documents signed by Mr. Wagner. The Court holds that the jury should first make a finding on the threshold issue of whether Plaintiff is a broker within the meaning of § 47–1–45. If the jury does indeed find that Plaintiff acted as a broker in the Osuna Property transaction, then the jury can make additional findings on whether the email exchanges in the record constitute sufficient notes or memoranda.

In conclusion, the Court holds that Plaintiff's status as a broker is only resolvable by the jury. The Court further holds that if the jury does determine that Plaintiff acted as a broker within the meaning of N.M. Stat. Ann. § 47–1–45, then the jury can make additional findings about whether the documents in the record constitute sufficient notes or memoranda. Defendant's request for summary judgment based on its affirmative defense under N.M. Stat. Ann. § 47–1–45 is therefore denied. *See Leone*, 810 F.3d at 1153-54 (stating that a defendant moving for

summary judgment on an affirmative defense can prevail only if its evidentiary showing is "conclusive" and that "[a]nything less should result in denial of summary judgment.")

### 2. Other Legal Theories Raised by Defendant

The parties next dispute the application of the doctrine of partial performance. "Part performance is a well-established exception to the statute of frauds." *Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc.*, 144 N.M. 55, 60, 183 P.3d 940, 945 (N.M. Ct. App. 2008). Under that doctrine, "[w]here an oral contract not enforceable under the statute of frauds has been performed to such extent as to make it inequitable to deny effect thereto, equity may consider the contract as removed from operation of the statute of frauds and decree specific performance." *Alvarez v. Alvarez*, 72 N.M. 336, 341, 383 P.2d 581, 584 (N.M. 1963) "[C]ourts have demanded that a litigant wishing to establish that performance has removed the agreement from the statute of frauds prove the existence of the agreement by clear, convincing, and cogent evidence." *Nashan v. Nashan*, 119 N.M. 625, 629, 894 P.2d 402, 406 (N.M. Ct. App. 1995). "[I]n part-performance cases, there must be performance that is 'unequivocally referable' to the agreement, meaning … that the performance be evidential of the existence of a contract and not readily explainable on some other ground." *Id.* Stated differently, "the performance must lead an outsider to 'naturally and reasonably' conclude that the contract alleged actually exists." *Beaver v. Brumlow*, 148 N.M. 172, 177, 231 P.3d 628, 633 (N.M. Ct. App. 2010). The party claiming partial performance "must prove that he has performed his part of the agreement to such extent that it would be inequitable to deny enforcement of the agreement." *Nashan,* 119 N.M. at 629, 894 P.2d at 406.

Defendant argues that the New Mexico Supreme Court's decision in *Harris v. Dunn*, 55 N.M. 434, 234 P.2d 823 (N.M. 1951) casts doubt on whether partial performance is allowed in

the context of N.M. Stat. Ann. § 47–1–45. As support, Defendant highlights a passage from the *Harris* court's statement that oral brokerage contracts, "*even where successfully performed*, would not support recovery of the agreed commission sued for." 55 N.M. at 439, 234 P.2d at 824 (citing *McCarthy v. Loupe*, 62 Cal. 299 (1882)). However, the context and facts of *Dunn* matter. In that case, buyers verbally employed an agent to buy property. *See id.* 55 N.M. at 435-36, 234 P.2d at 821. Rather than fulfilling that promise, the agent then fraudulently purchased the property for himself and took title under an assumed name. *See id*. As a defense to the buyers' lawsuit, the agent raised the Statute of Frauds, and the district granted the agent's motion to dismiss. *See id.* The sole issue on appeal was whether the agent could raise that Statute of Frauds. *See id.* at 55 N.M at 435, 234 P.2d at 821. Answering no, the New Mexico Supreme Court ruled that the Statute of Frauds cannot itself be used as "an instrumentality of fraud." *Id.* at 55 N.M. at 439, 234 P.2d at 824.

*Dunn* does not support Defendant's argument that partial performance is not allowed in the context of N.M. Stat. Ann. § 47–1–45. As noted, that issue was not presented in *Dunn*. The sole issue decided in that case was that a verbally employed agent cannot raise the Statute of Frauds as a way to commit fraud, and the context of the entire passage cited by Defendant makes clear that the court was considering those case-specific facts. Finally, this Court's independent research reveals no subsequent case that cites *Dunn* for the proposition that Defendant does.

The other two cases that Defendant relies upon, *Bosque Farms* and *Adams*, likewise do not support its contention that partial performance is prohibited in the context of N.M. Stat. Ann. § 47–1–45. In *Bosque Farms*, 107 N.M. at 118, 753 P.2d at 897, the New Mexico Supreme Court addressed the partial performance exception in the context of services not to be performed within a year—something that is simply not at issue in this case. And in *Adams*, 87 N.M. at 117, 529

P.2d at 1238, also cited by Defendant, the New Mexico Court of Appeals considered the effect of an oral modification to a brokerage agreement, but ultimately declined to address or decide the plaintiff's arguments concerning equitable principles because the plaintiff did not preserve those arguments for appeal. Therefore, these two cases—one dealing with services not to be performed within a year and the other dealing with a plaintiff's failure to preserve the relevant issue for appeal—do not cast doubt on partial performance in the context of N.M. Stat. Ann. § 47–1–45.

Having concluded that the doctrine of partial performance could apply to this case, the Court further holds that Plaintiff has sufficiently raised a genuine issue of material fact regarding whether it would be inequitable to deny enforcement of the parties' alleged agreement. For summary judgment purposes, Plaintiff has submitted sufficient evidence of "acts that make up the part of the performance." *Nashan,* 119 N.M. at 630, 894 P.2d at 407 (stating that partial performance is required to show that "there must have been a contract or plaintiff would not have performed the acts that make up the part performance.") Plaintiff testified that Mr. Wagner told Plaintiff, "you're going to go negotiate the deal and you're my consultant. You go negotiate the deal, and I'll pay you one percent when it closes, if it closes." McCall Depo. at 24:11; 25:13-14. Plaintiff then did, in fact, attend the April 7 meeting. Defendant argues that there is a more "plausible explanation" for Plaintiff's attendance: "that he hoped to demonstrate his negotiation skills." Doc. 29 at 15. However, Plaintiff disputes that he was only there to show-off his negotiating skills, and the relevant inquiry is only whether an outsider considering the relevant facts could "naturally and reasonably" conclude that the agreement exists. *Beaver*, 148 N.M. at 177, 231 P.3d at 633. The Court holds that Plaintiff has raised a genuine issue of material fact regarding whether it would be inequitable to deny enforcement of the alleged agreement.

The Court now addresses Defendant's final argument, which concerns the "predominant purpose" or "primary purpose" of the alleged contract between the parties. Doc. 23 at 17. According to Defendant, Plaintiff may try to argue that N.M. Stat. Ann. § 47–1–45 does not apply to the portion of the parties' alleged oral contract dealing with negotiating Allen Sigmon's fee. Defendant recognizes that § 47–1–45 covers interests in land, and that negotiating another broker's fee may not, strictly speaking, be an interest in land. But, according to Defendant, when one looks to the predominant or primary purpose of the parties' alleged contract, it was for Plaintiff to negotiate the Osuna Property lease, which most definitely is an interest in land. So, according to Defendant, § 47–1–45 applies with equal force to the entire contract, even though Allen Sigmon fee's may not be an interest in lands within the meaning of § 47–1–45.

The Court denies Defendant's summary judgment motion on the basis of the "primary purpose" of the contract. Defendant's invocation of the primary purpose concept derives from Uniform Commercial Code, which is not at issue here. The single case that Defendant cited in its motion is a UCC case which involved a "mixed" contract for interior design services and to sell furnishings. *See Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 708, 845 P.2d 800, 802 (N.M. 1992). In situations where a mixed contract covers both goods and non-goods, the court must determine whether the UCC or common law governs the dispute. *See id.* The *Kirkpatrick* court explained that courts should apply the "primary purpose" test and ask whether the primary purpose of the contract is to sell goods or to render services. *Id.* But as noted, *Kirkpatrick* is a UCC case and Defendant has not plausibly explained how *Kirkpatrick* or the UCC would be relevant in a case like this.

In its reply brief, Defendant attempts to overcome its misplaced reliance on *Kirkpatrick* by citing another case, *State for Use of Elec. Supply Co. v. Kitchens Const., Inc.*, 106 N.M. 753,

755, 750 P.2d 114, 116 (N.M. 1988), to support its claim that the primary purpose concept has a foothold outside of the UCC context. That case does not apply to these facts. While the court in *Kitchens Const.* did indeed use the words "principal purpose," it did so in an entirely different context—specifically a general contractor's oral promise to a supplier to pay the debt of a subcontractor. The court held that "although it is well-settled that an oral agreement to guarantee the debts of a third party is not ordinarily enforceable, it is equally undeniable that if the principal purpose of the agreement is to subserve the pecuniary interests of the promisor, the statute of frauds will not apply." *Id.* *Kitchens Const.* is factually and legally distinguishable because this is not a case where the principal purpose of the alleged agreement was for a party to serve the financial interests of a promisor of a debt. Therefore, because Defendant has failed to convincingly show that its "primary purpose" argument is even legally applicable to the case at hand, summary judgment in its favor is denied.

## CONCLUSION

For the reasons stated herein, it is therefore ORDERED that Defendant Wagner Equipment Company's Motion for Summary Judgment (Doc. 23) is DENIED.


HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE